IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| Darla Burke, Kevin Burke, Jacob Burke, & Elizabeth Burke-O'Beirne<br>Plaintiffs, | )<br>)<br>)<br>)<br>) |
| v. | ) CIVIL ACTION NO: _____<br>)<br>) |
| United States Department of the Navy,<br>Defendant. | )<br>)<br>)<br>) |

# PLAINTIFFS' ORIGINAL COMPLAINT

This is a case about the United States Department of the Navy (hereinafter "DON" or "Defendant") ignoring crime victims' rights following the death of an active duty military member, Nathan R. W. Burke. The DON's actions were a tort against Plaintiffs Darla Burke, Kevin Burke, Jacob Burke, and Elizabeth Burke-O'Beirne (hereinafter "Nathan's family" or "Plaintiffs"), specifically, intentional infliction of emotional distress.

## PARTIES

1.  Darla Burke is the mother of the late Nathan R. W. Burke.

2.  Kevin Burke is the father of the late Nathan R. W. Burke.

3.  Jacob Burke is the brother of the late Nathan R. W. Burke.

4.  Elizabeth Burke-O'Beirne is the sister of the late Nathan R. W. Burke.

5.  Naval Criminal Investigative Service ("NCIS") is a law enforcement organization within the DON.

## JURISDICTION

6.  Jurisdiction is proper in accordance with 28 U.S.C. § 2674 and 28 U.S.C. § 1346(b)(1).

## VENUE

7. Venue is proper in accordance with 28 U.S.C. § 1402(b), as all Plaintiffs reside in this district.

## CONDITIONS PRECEDENT

8. Plaintiffs timely presented their claims in writing to the DON. This suit is filed within six months after the DON's final written notice of denial of the claims. (*See* Exhibit 1).

## FACTS

General Facts Regarding Nathan

9. Nathan R. W. Burke was born on September 5, 1990.

10. Nathan died on April 13, 2021.

11. Nathan was performing active duty military service with the DON at the time of his death.

12. Nathan was single with no children at the time of his death.

Facts Regarding Nathan's Service and Death

13. Nathan began active duty military service with the DON in 2020.

14. Nathan began his military service by attending training at Great Lakes Naval Station in Illinois.

15. On February 16, 2021, Nathan began training at Naval Air Station Pensacola in Florida.

16. On April 5, 2021, Nathan was in the Aviation Rescue Swimmer Course, which is located at the Aviation Rescue Swimmer School at Naval Air Station Pensacola in Florida.

17. While participating in a swimming proficiency and conditioning event in the pool on April 5, 2021, Nathan stopped moving.

18. Nathan was pulled from the pool.

19. Nathan was unresponsive, had no pulse, and was not breathing.

20. Emergency medical services (EMS) were called while instructors attempted emergency medical care.

21. EMS arrived and transported Nathan to Baptist Hospital in Pensacola, Florida.

22. After arrival and admission to the hospital, Nathan was unresponsive and his condition did not improve.

23. On approximately April 7, 2021, doctors determined Nathan had suffered an anoxic brain injury, meaning his brain had been deprived of oxygen, resulting in a non-recoverable brain injury.

24. While hospitalized, Nathan's treating neurologist estimated that, on April 5, 2021, Nathan's brain had not received oxygen for at least 30 minutes.

25. On April 13, 2021, life support measures were removed. Nathan died shortly thereafter.

Facts Regarding the Medical Examiner Reports

26. The Office of the District One Medical Examiner in Florida (hereinafter "the medical examiner") is a civilian entity, unaffiliated with the DON, that conducted Nathan's autopsy.

27. On September 2, 2021, the medical examiner contacted the DON to request a phone number for NCIS at Naval Air Station Pensacola.

28. On September 2, 2021, after obtaining a phone number for NCIS, the medical examiner called NCIS. NCIS did not call the medical examiner back, despite the medical examiner leaving a message.

29. On September 8, 2021, the DON represented to the medical examiner that NCIS was not investigating Nathan's death. This representation was made by a Navy medical provider who interacted with the medical examiner.

30. On November 2, 2021, the medical examiner issued a report based on Nathan's autopsy and other available information.

31.     The medical examiner report concluded that Nathan's cause of death was "Undetermined" and that Nathan's manner of death was "Undetermined."

32.     On December 15, 2021, a military member with initials KM,[1] who had been in the same training and on the same team as Nathan, emailed the medical examiner.

33.     The email described the conditioning that Nathan's team had been subjected to prior to conducting their pool exercises on April 5, 2021.

34.     The email described the efforts of their instructor of the day (IOD) to intentionally withhold water from Nathan and his teammates while subjecting them to extreme conditioning, including descriptions such as:

   a. "We began the day with our run. From the schoolhouse to the track is about 1/4 or 1/2 of a mile I'd say depending on which way around you go maybe but our [IOD] has us sprinting there damn near, so running to the track alone was a hard pace to start our day with. After we arriving at the track we usually stopped to drop our water but we just went straight into the run and didn't stop. We held onto our water bottles but it was a rule to not drink water unless we were told to, usually they'd tell us "hydrate freely" or they'd have us stop and "wagon wheel" or walk around the bleachers drinking water, we got no such thing." (errors in original).

   b. "Without straying away from the point we ran 5 miles continuously and did not stop and did not drink water at least I never did and I truly never saw anyone else drinking water either. By the end of the run I was cramping so bad I was limping and I've ran track for the majority of my life and was not hurt prior to this Monday. From what we've done the week prior, what we've been told by both instructors and graduating classes is that proper protocol was to stop every so often and wagon wheel around the bleachers for a couple minutes and drink water and then continue until we hit right around our 5 mile mark and run back to the schoolhouse, yet, we did not do so."

   c. "After running back to the schoolhouse what we typically did as well as other classes was get a 5 or 10 minute bathroom and water break. That day we did not get that and went straight into the grinder. The grinder is a serious of consecutive workouts, push-ups, sit-ups, crunches, left lifts, flutter kicks, pull-ups, sprinting, you name it. It may sound easy but even on a good day it is not. We were all in shape but after running 5 miles with no water it was just brutal doing the grinder and not only did we do one but we did two back to back. Typically after each exercise the Assistant Class Leader says, "Hydrate square yourselves away!" and at that time is when you'd

---

[1] The names of non-party military members are withheld in this complaint for privacy and security. However, the names have previously been disclosed to the DON.

4

      hydrate and tuck your shirt back in. We did not get that. [IOD] said "Nope, leaning rest most of the time." Which we've seen before on other days but rarely and definitely not the whole grinder. After running 5 miles with no water then going back to the schoolhouse and going straight into physical training and still getting no water in the spring time when summer is on the way in one of the most humid places in the country on concrete I'm sure you can imagine how we felt." (errors in original).

    d. "Towards the middle of the second one I had cramped up so bad that I couldn't even walk and ended up going to medical and eventually physical therapy for it."

35. At some point after issuance of the initial medical examiner report, the medical examiner received a phone call from a military member who knew Nathan. Based on the medical examiner's understanding, this military member was not on Nathan's team, but was in the same training and was familiar with Nathan's death. This military member told the medical examiner information that corroborated the email from KM.

36. On January 26, 2022, the medical examiner issued an amended report based on the new information they received.

37. The amended medical examiner report concluded that Nathan's cause of death was "Complications of dehydration and environmental exposure due to extreme physical exertion with inadequate hydration and rest during military training."

38. The amended medical examiner report concluded that the manner of death was "Accident."

Facts Regarding Nathan's Family's Efforts to Obtain a Criminal Investigation

39. After Nathan's death, multiple military members informed Nathan's family that Nathan was noticeably struggling during conditioning on April 5, 2021, specifically, during the grinder. These military members informed Nathan's family that it was unusual for Nathan to struggle during conditioning. These military members informed Nathan's family that the instructors forced Nathan to remain on the grinder and complete his rotations, despite it being apparent that something was not right.

40. After Nathan's death, a military member with initials PW, who had been in the same training as Nathan, communicated with Nathan's family via message that, "I have known for some time now that it could have been avoided or at least felt it could have been. I hope the truth will come out."

41. After Nathan's death, a military member with initials KDC, who had been in the same training and on the same team as Nathan, contacted Nathan's family. KDC stated that, after the grinder, in the moments before entering the pool, Nathan was "panting like a dog" trying to breathe, but the instructors forced Nathan to continue to the pool exercises. KDC stated that multiple students were shocked the instructors were making Nathan continue with conditioning given his unusual struggles during the grinder and his struggles to breathe.

42. After Nathan's death, a military member with initials IR, who had been in the same training as Nathan, communicated with Nathan's family. IR provided information that was consistent with what other military members had told Nathan's family, specifically, that Nathan struggled during the grinder on April 5, 2021, which was unusual, and that the instructors intentionally withheld water during the grinder.

43. After Nathan's death, a military member with initials TH, who had been in the same training as Nathan, communicated with Nathan's family via message that, "we even had people on my team that were falling out and going to medical because of that and we was told that we wasn't even supposed to train that day because of the heat and they made us anyways." (errors in original). TH further stated that, based on what he was told, Nathan was "panting" in the locker room just prior to the swim, and the petty officers were giving Nathan a "hard time" because they believed Nathan was "slacking." TH further stated that he felt Nathan's death could have been avoided.

44. After Nathan's death, Nathan's family filed congressional inquiries with the office of Representative Kay Granger and, later, the office of Senator Ted Cruz, about the DON's lack of a criminal investigation into Nathan's death.

45.     On January 6, 2022, Nathan's family (specifically, Plaintiffs-Darla and Kevin Burke) spoke via phone with personnel from NCIS, specifically, agents with initials BB and KR.[2]

46.     BB and KR were with an NCIS legislative affairs office and they were following-up on the congressional inquiry submitted to Representative Granger.

47.     During the call on January 6, 2022, BB and KR stated that, if NCIS initiated a criminal investigation, they (the personnel on the call) would not be conducting it, as it would be assigned to the local NCIS office in Pensacola. BB and KR further stated that they were recommending an investigation, and they sounded shocked that NCIS had not already initiated an investigation. BB and KR informed Plaintiffs-Darla and Kevin Burke that they (Darla and Kevin) would be interviewed by NCIS as part of the investigation.

48.     On January 13, 2022, BB and KR (the NCIS personnel on the call on January 6, 2022) again spoke with Plaintiffs-Darla and Kevin Burke. During this conversation, BB and KR indicated that, having spoken with a supervisor, NCIS now intended to initiate a criminal investigation, which would be conducted by the local NCIS office in Pensacola. BB and KR confirmed that Plaintiffs-Darla and Kevin Burke would be interviewed by NCIS as part of the investigation.

49.     On January 24, 2022, NCIS provided an interim response to the congressional inquiry submitted to Representative Granger.

50.     NCIS's interim response on January 24, 2022, was sent to Representative Granger, whose office subsequently sent it to Nathan's family.

51.     NCIS's interim response on January 24, 2022, signed by an agent with initials DS, Assistant Director of Criminal Investigations and Operations, stated, in part, as follows:

> "Upon review of your inquiry and a subsequent phone call with Mr. and Mrs. Burke on January 6, 2022, NCIS Headquarters contacted the local NCIS office to obtain some facts from Nathan Blake's [sic] command and from the Naval Safety Center. It was determined

---

[2] All NCIS personnel identified in this complaint were DON employees acting within the course and scope of their employment.

7

from the local office that they were not notified of Nathan's death. At this time NCIS is not conducting an investigation, but will decide a course of action after obtaining information from the command and the Naval Safety Center. An update from NCIS to Mr. and Mrs. Burke and their legal representative will be provided within thirty days from the date of this letter. The update will provide what course of action, if any, NCIS will take based on the information obtained."

52. Nathan's last name was not "Blake" as stated in NCIS's interim response on January 24, 2022.

53. On February 2, 2022, Nathan's family, through counsel, contacted the NCIS personnel on the call on January 6, 2022 (BB and KR). Nathan's family requested an update on NCIS's investigation or, alternatively, a point of contact at the local NCIS office in Pensacola that would be conducting the investigation.

54. On February 8, 2022, still having not received any information about an NCIS investigation, Plaintiff-Kevin Burke sent an email with Nathan's amended medical examiner report to the NCIS personnel on the call on January 6, 2022 (BB and KR). In the same email, Plaintiff-Kevin Burke stated that the NCIS office in Pensacola had not yet contacted Nathan's family.

55. On February 16, 2022, Nathan's family, through counsel, contacted the NCIS personnel on the call on January 6, 2022 (BB and KR). Nathan's family requested an update on NCIS's investigation or, alternatively, a point of contact at the local NCIS office in Pensacola that would be conducting the investigation.

56. On February 21, 2022, Nathan's family, through counsel, contacted the NCIS personnel on the call on January 6, 2022 (BB and KR). Nathan's family requested an update on NCIS's investigation or, alternatively, a point of contact at the local NCIS office in Pensacola that would be conducting the investigation.

57. Up until that point in time, despite repeated requests, Nathan's family had not been provided any updates on the NCIS investigation nor were they provided a point of contact at the NCIS office in Pensacola.

58. On March 11, 2022, NCIS provided a final response to the congressional inquiry submitted to Representative Granger.

59. NCIS's final response on March 11, 2022, was sent to Representative Granger, whose office subsequently sent it to Nathan's family.

60. NCIS's final response on March 11, 2022, signed by DS, Assistant Director of Criminal Investigations and Operations, stated as follows:

> "This letter serves as a follow up to your email to the Navy Office of Legislative Affairs, concerning an inquiry submitted by your constituent, Mr. Kevin Burke, into a Naval Criminal Investigative Service (NCIS) death investigation.
>
> Upon review of your inquiry and request for an investigation, NCIS Headquarters instructed the local NCIS office to conduct an inquiry regarding the death of Nathan Burke. Following that inquiry, it was determined by NCIS Headquarters that there was no criminality involved. Therefore, NCIS will not open an investigation into this matter at this time."

Facts Regarding Military Laws and Regulations

61. Violating or failing to obey a lawful general order or regulation is a criminal offense in the military, prohibited by Article 92(1)of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892(1).

62. Having knowledge of and failing to obey a lawful order is a criminal offense in the military, prohibited by Article 92(2) of the UCMJ, 10 U.S.C. § 892(2).

63. Dereliction in the performance of duties is a criminal offense in the military, prohibited by Article 92(3) of the UCMJ, 10 U.S.C. § 892(3).

64. Cruelty towards a subordinate is a criminal offense in the military, prohibited by Article 93 of the UCMJ, 10 U.S.C. § 893.

65. Oppression or maltreatment of a subordinate is a criminal offense in the military, prohibited by Article 93 of the UCMJ, 10 U.S.C. § 893.

66. Involuntary manslaughter is a criminal offense in the military, prohibited by Article 119(b) of the UCMJ, 10 U.S.C. § 919(b).

67. Negligent homicide is a criminal offense in the military, prohibited by Article 134 of the UCMJ, 10 U.S.C. § 934, enumerated at part IV, paragraph 103, of the Manual for Courts-Martial (2019 ed.).

68. The Crime Victims' Rights Act, 18 U.S.C. § 3771(e)(2)(A), defines a victim as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." In the case of a deceased victim, family members may assume the victim's rights in accordance with 18 U.S.C. § 3771(e)(2)(B).

69. The Crime Victims' Rights Act, 18 U.S.C. § 3771(a), provides certain rights to victims of crimes, including:

    a. The right to proceedings free from unreasonable delay; and

    b. The right to be treated with fairness and respect for their dignity and privacy.

70. Article 6b(b) of the UCMJ, 10 U.S.C. § 806b(b), defines a victim as "an individual who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense under this chapter." In the case of a deceased victim, family members may assume the victim's rights in accordance with Article 6b(c), 10 U.S.C. § 806b(c).

71. Article 6b(a) of the UCMJ, 10 U.S.C. § 806b(a), provides certain rights to victims of crimes, including:

    a. The right to proceedings free from unreasonable delay; and

    b. The right to be treated with fairness and respect for their dignity and privacy.

72. Department of Defense Instruction (DoDI) 1030.02, *Victim and Witness Assistance*, defines a victim as a "person who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime committed in violation of the UCMJ."

73. DoDI 1030.02, section 3, para. 3.2.a., provides certain rights to victims of crimes, including:

    a. The right to proceedings free from unreasonable delay;

    b. The right to be treated with fairness and respect for their dignity and privacy; and

    c. The right to express their views to the commander or convening authority as to disposition of the case.

74. Secretary of the Navy Instruction (SECNAVINST) 5430.107A, *Mission and Functions of the Naval Criminal Investigative Service,* enclosure 4, para. 2.d., states that "NCIS has primary responsibility for investigating actual, suspected, and alleged major criminal offenses to include: *[a]ny non-combat deaths on or off DON installations*, facilities, vessels, or aircraft, when the cause of death cannot be medically attributable to disease or natural causes, or until criminal causality can be reasonably excluded. For non-combat deaths that occur off-base or outside of the primary investigative jurisdiction of NCIS, NCIS will be the DON lead agency for coordination and/or investigative support to the investigative lead agency. If a non-DON agency with primary jurisdiction declines to investigate, NCIS will assume investigative jurisdiction." (emphasis added).

75. Rule for Courts-Martial 306(a) states that, "Each commander has discretion to dispose of offenses by members of that command. Ordinarily the immediate commander of a person accused or suspected of committing an offense triable by court-martial initially determines how to dispose of that offense. A superior commander may withhold the authority to dispose of offenses in individual cases, types of cases, or generally. A superior commander may not limit the discretion of a subordinate commander to act on cases over which authority has not been withheld."

## CAUSES OF ACTION

76. After administrative filing of the present causes of action to the DON's Tort Claims Unit, and after multiple congressional complaints, on approximately July 1, 2022, NCIS initiated a criminal investigation, which remains open.

77. The initiation of a criminal investigation does not erase the conduct of NCIS between April 5, 2021 and July 1, 2022. More specifically, prior to July 1, 2022:

   a. Intentionally or recklessly, NCIS never conducted an investigation into Nathan's death, notwithstanding the fact that NCIS has primary responsibility for investigating non-combat deaths in the DON. An NCIS investigation was mandatory under the circumstances, and NCIS advertises on its website, under Core Mission Areas: Criminal Investigations, that "NCIS also investigates *any* non-combat death involving a Navy or USMC service member." (emphasis added).

   b. Intentionally or recklessly, the DON never took steps to ensure NCIS conducted an investigation into Nathan's death, notwithstanding the fact that NCIS has primary responsibility for investigating non-combat deaths in the DON. An NCIS investigation was mandatory under the circumstances, and NCIS advertises on its website, under Core Mission Areas: Criminal Investigations, that "NCIS also investigates *any* non-combat death involving a Navy or USMC service member." (emphasis added).

   c. Intentionally or recklessly, NCIS never spoke with the medical examiner, including after the medical examiner amended their report on January 26, 2022.

   d. Intentionally or recklessly, NCIS never learned what new evidence caused the medical examiner to amend their report on January 26, 2022.

   e. Intentionally or recklessly, despite repeated requests, NCIS never provided Nathan's family a point of contact at the local NCIS office in Pensacola, thereby preventing Nathan's family from relaying relevant information about Nathan's death.

f. Intentionally or recklessly, NCIS never interviewed Nathan's family as part of any type of criminal investigation or inquiry.

g. Intentionally or recklessly, NCIS never provided Nathan's family an opportunity to send NCIS relevant documentary evidence about Nathan's death.

h. Intentionally or recklessly, NCIS called Nathan by the wrong name in its January 24, 2022, interim response to the congressional inquiry submitted to Representative Granger.

i. Intentionally or recklessly, NCIS's January 24, 2022, interim response contained an affirmative misrepresentation or a material omission—specifically, stating that, "It was determined from the local office that they were not notified of Nathan's death," when in fact the medical examiner had contacted the local NCIS office in Pensacola, with contact information provided by the DON, but the local NCIS office never returned the call. Further, if in fact the local NCIS office was not aware of Nathan's death, such lack of knowledge was intentional or reckless given Nathan's death was publicized in local and national news, and given deaths on a military installation are a relatively rare occurrence of which the installation's law enforcement should have knowledge.

j. Intentionally or recklessly, despite affirmatively representing that they would provide an update within 30 days of their interim response on January 24, 2022, NCIS did not provide an update within that time period.

k. NCIS's final response to the congressional inquiry submitted to Representative Granger contained a material omission—specifically, omitting that NCIS never interviewed Nathan's family or gave them an opportunity to provide relevant evidence. This material omission was intentional or reckless.

13

    l. Intentionally or recklessly, NCIS never provided Nathan's family any information on what the NCIS local office's "inquiry" consisted of or what facts, if any, it uncovered.

    m. Intentionally or recklessly, the DON allowing NCIS to unilaterally conclude that "no criminality [was] involved" in Nathan's death violated military law because NCIS has no authority to make such a disposition decision in accordance with Rule for Courts-Martial 306. Further, NCIS has no authority under any source of military law to dispose of criminal misconduct.

    n. Intentionally or recklessly, the DON violated Plaintiffs' rights under § 18 U.S.C. 3771, Article 6b of the UCMJ, and DoDI 1030.02.

    o. Intentionally or recklessly, the DON took affirmative steps to avoid uncovering crimes which may have contributed to Nathan's death, despite Nathan's family, the medical examiner, and multiple DON personnel possessing evidence of such crimes, including violations of Article 92, Article 93, Article 119, and Article 134, UCMJ.

78. The conduct of NCIS and the DON was extreme and outrageous under the circumstances.

79. The conduct of NCIS and the DON demonstrates that, until being sued, they never seriously considered the possibility that criminal acts may have contributed to Nathan's death.

80. The conduct of NCIS and the DON caused Plaintiffs emotional distress, specifically:

    a. Increased feelings of anxiety;

    b. Feelings of being completely ignored;

    c. Feelings of being misled into believing NCIS intended to initiate a criminal investigation;

    d. Feelings of helplessness given their limited avenues of recourse, particularly when the DON allowed NCIS to dispose of the case in violation of military law;

  e. Feelings of anger, particularly when NCIS called Nathan by the wrong name in the January 24, 2022, interim response, and when NCIS failed to contact the medical examiner even after Plaintiff-Kevin Burke sent NCIS the amended medical examiner report; and

  f. Feelings of shock that the DON would act so recklessly after the death of a service member.

81. The emotional distress suffered by Plaintiffs was severe given the situation involved the untimely and unexplained death of Nathan, a dear loved one and immediate family member.

<u>Count 1—Intentional Infliction of Emotional Distress (Darla Burke)</u>

82. Plaintiff-Darla Burke hereby incorporates all prior paragraphs of this complaint.

83. For the reasons set forth above, Defendant's actions constituted intentional infliction of emotional distress against Plaintiff-Darla Burke.

<u>Count 2—Intentional Infliction of Emotional Distress (Kevin Burke)</u>

84. Plaintiff-Kevin Burke hereby incorporates all prior paragraphs of this complaint.

85. For the reasons set forth above, Defendant's actions constituted intentional infliction of emotional distress against Plaintiff-Kevin Burke.

<u>Count 3—Intentional Infliction of Emotional Distress (Jacob Burke)</u>

86. Plaintiff-Jacob Burke hereby incorporates all prior paragraphs of this complaint.

87. For the reasons set forth above, Defendant's actions constituted intentional infliction of emotional distress against Plaintiff-Jacob Burke.

<u>Count 4—Intentional Infliction of Emotional Distress (Elizabeth Burke-O'Beirne)</u>

88. Plaintiff-Elizabeth Burke-O'Beirne hereby incorporates all prior paragraphs of this complaint.

89. For the reasons set forth above, Defendant's actions constituted intentional infliction of emotional distress against Plaintiff-Elizabeth Burke-O'Beirne.

## DAMAGES

90. As a result of Defendant's actions, Plaintiffs suffered severe emotional distress, which included mental and emotional pain and anguish in the past and in the future.

## PRAYER FOR RELIEF

91. For these reasons, Plaintiffs request a judgment against Defendant for the following:

   a. Compensatory damages against Defendant of $8,000,000, reflecting $2,000,000 for each Plaintiff;

   b. Postjudgment interest;

   c. Court costs, including the cost of filing suit; and

   d. All other relief which may be just and proper under the circumstances.

Respectfully submitted by counsel for Plaintiffs,

/s/Ross A. Brennan
Bar No. 24120582
Cronauer Law—Texas Office
668 Main St, Unit D
Buda, TX 78610
512-733-5151 (phone)
815-895-4070 (fax)
ross@cronauerlaw.com


/s/ Jamshyd (Jim) M. Zadeh
Jamshyd (Jim) M. Zadeh
Texas State Bar No. 22239000
Law Office of Jim Zadeh, P.C.
1555 Rio Grande Avenue
Fort Worth, Tx 76102 817-335-5100
817-335-3974-fax
jim@zadehfirm.com